**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**MICHAEL RAY SAMMONS,**

**Plaintiff,**

**v.**                                                        **Case No.: 2:19-cv-00319**

**ANDREW M. SAUL,
Commissioner of the
Social Security Administration,**

**Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 13, 14).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that it requests

remand of the Commissioner's decision, (ECF No. 13); the Commissioner's motion for judgment on the pleadings be **DENIED**, (ECF No. 14); the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On July 9, 2015, Plaintiff Michael Ray Sammons ("Claimant") filed an application for DIB, alleging a disability onset date of May 26, 2015 due to "heart attack, heart blockage, stress, high blood pressure, [and] back pain." (Tr. at 201-02, 215). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 75-79, 83-85). Claimant subsequently filed a request for an administrative hearing, which was held on April 4, 2018 before the Honorable Jon K. Johnson, Administrative Law Judge (the "ALJ"). (Tr. at 30-49). On April 25, 2018, the ALJ issued a written decision, finding that Claimant was not disabled as defined in the Social Security Act. (Tr. at 7-24). The ALJ's decision became the final decision of the Commissioner on February 27, 2019 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 13), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 14), to which Claimant filed a reply, (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 39 years old on his alleged disability onset date and 42 years old on the date of the ALJ's decision. (Tr. at 16). He completed the tenth grade and worked as a heavy equipment operator in the coal mining industry. (Tr. at 216). His primary language is English. (Tr. at 214).

## III.    Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the

adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after

rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2020. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 26,

2015, his alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant's coronary artery disease/chronic heart failure and degenerative disc disease were severe impairments. (*Id.*, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 12-13, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can never climb ladders, ropes, or scaffolds. He can perform all of the other postural activities occasionally. He should avoid temperature extremes and concentrated exposure to vibration and hazards.

(Tr. at 13-16, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any of his past relevant work. (Tr. at 16, Finding No. 6).

Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 16-17, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual on his disability onset date; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 16, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a hand packer, product labeler, and cleaner. (Tr. at 16-17, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 17, Finding No. 11).

### IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two challenges to the Commissioner's decision. First, Claimant argues that the ALJ erred in concluding that his chronic heart failure did not meet or equal the criteria of Listing 4.02. (ECF No. 13 at 7-10). According to Claimant, objective evidence during the relevant period, including his echocardiogram and stress test results, clearly satisfied the listing criteria. (*Id.* at 9). Second, Claimant contends that the ALJ failed to explain in the RFC analysis how his degenerative disc disease of the cervical spine affected his ability to perform the mental and physical demands of competitive employment on a regular and competitive basis, and the ALJ did not explain the rationale for omitting additional RFC limitations relating to the impairment. (*Id.* at 11).

In response to Claimant's challenges, the Commissioner argues that the ALJ correctly analyzed Claimant's cardiac and cervical spine impairments. (ECF No. 14). Regarding Listing 4.02, the Commissioner cites that the ALJ relied on other objective evidence during the relevant period that did not meet the listing criteria, as well as Claimant's cardiologist's statement on March 4, 2018 that Claimant's condition improved to the point that he was functional class I-II, which indicated mild symptoms. In terms of Claimant's neck impairment, the Commissioner asserts that the ALJ considered all of the relevant evidence and fully accounted for any functional limitations that were indicated. (*Id.* at 15).

Claimant filed a reply to the Commissioner's response, asserting that the regulations do not allow the ALJ to rebut objective evidence that satisfies the listing by simply pointing to other evidence from the record that does not meet the threshold. (ECF No. 15 at 1). Furthermore, Claimant emphasizes that, although his test results in

7

the earlier days of his claim might have been below the benchmarks established in the listing, those instances were in the minority of the records, and his more recent testing over the past two years clearly satisfied Listing 4.02. (*Id*. at 2).

## V.    **Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court. The evidence that is most relevant to the instant matter is summarized as follows.

### A.    *Treatment Records*

On May 26, 2015, Claimant suffered extreme pressure in his chest that was extending into his left arm, and he was air lifted from his job on a coal mining site to the emergency room at Charleston Area Medical Center (hereinafter "CAMC"). He was diagnosed with extensive ST elevated anterolateral myocardial infarction with reciprocal inferior depression. (Tr. at 321-22). He underwent a left heart and coronary artery catheterization and balloon angioplasty of the infarction and a stent was placed in his left anterior descending artery. (Tr. at 473, 582). Claimant was also noted to have chronic total occlusion of the right coronary artery, and he was placed on cardiac medications. (Tr. at 474, 582). His ejection fraction (hereinafter "EF") was 40 percent.[1] (Tr. at 474).

On July 10, 2015, Claimant underwent a treadmill exercise stress test at CAMC Cardiac Imaging Center using a Standard Bruce protocol.[2] (Tr. at 837). His EF was 33

---

[1] EF refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. It is typically measured only in the left ventricle, the heart's main pumping chamber. An EF of 55 percent or above is considered normal, an EF between 50 and 55 percent is considered borderline, and an EF 50 percent or lower is considered reduced.

[2] "The Bruce protocol is a standard test in cardiology and is comprised of multiple exercise stages of three minutes each. At each stage, the gradient and speed of the treadmill are elevated to increase work output, called METS." https://www.aopa.org/go-fly/medical-resources/health-conditions/heart-and-circulatory-system/bruce-protocol-stress-test

percent. (*Id.*). Claimant was able to complete an estimated 4.6 METS before the test was terminated secondary to fatigue. (*Id.*). Given Claimant's positive stress test and continued chest pain, three stents were inserted in his totally occluded right coronary artery on August 27, 2015. (Tr. at 580, 583). His EF was 30 to 35 percent per his echocardiogram on that date. (Tr. at 588). However, the interpreting cardiologist, Michelle Consolini, M.D., estimated his EF on the lower end of the range, stating that it was "on the order of 30 [percent]." (Tr. at 589).

A repeat echocardiogram was taken on October 27, 2015. Claimant's EF was moderately impaired in the range of 35 and 40 percent. (Tr. at 597). On February 29, 2016, Claimant presented to his treating cardiologist, Stephen Lewis, M.D., complaining of mild, but sharp, chest pains over the past month. (Tr. at 616). He reported that he went to the emergency room two weeks earlier due to right arm pain and swelling in his hands. (*Id.*). His CAT scan reportedly showed a bulging disc in his neck, which was the possible cause of a pinched nerve in his arm. (*Id.*). However, Claimant related that his EKG was normal at that time. (*Id.*). Dr. Lewis ordered a stress test and left and right heart catheterization with possible coronary intervention. (Tr. at 618). The left heart catheterization was performed on March 14, 2016 and showed that Claimant's EF was less than 35 percent. (Tr. at 647). Claimant underwent an additional stress test the next day, on March 15, 2016, which measured his EF to be 29 percent. (Tr. at 709-10). His echocardiogram was also taken on March 15, and it estimated his left ventricle EF to be 30 to 35 percent. (Tr. at 744).

On May 9, 2016, Claimant was referred to neurologist, Dolores Santamaria, M.D., for neck and right hand pain, which began two years earlier when Claimant had a heart attack and underwent heart surgery. (Tr. at 625). Dr. Santamaria diagnosed

Claimant with carpal tunnel syndrome, cubital tunnel syndrome, cervical radiculopathy, and weakness. (Tr. at 626). She ordered nerve conduction studies and an MRI of Claimant's cervical spine. (Tr. at 626-27). The MRI, which was taken on May 31, 2016, showed bilateral neural foraminal narrowing at C5-6 that was moderate on the right and moderate-to-severe on the left. (Tr. at 629). However, there was no contact with Claimant's spinal cord, and his spinal cord signal was normal. (*Id.*).

Claimant was referred to a neurosurgeon, Dwight Saulle, M.D., for his complaints of numbness and tingling in his forearms and hands. (Tr. at 1029). Dr. Saulle examined Claimant on September 21, 2016 and diagnosed him with cervical spondylosis, bilateral carpal tunnel syndrome, and cubital tunnel syndrome. (Tr. at 1031). Claimant advised that the symptoms were not bothering him enough that he wanted to consider surgery to correct the problem. (*Id.*). As such, Dr. Saulle did not proceed with the EMG. Dr. Saulle told Claimant to return if he wished to consider surgical intervention. (*Id.*).

On May 26, 2016, Claimant had a repeat left heart catheterization. (Tr. at 910). His EF was estimated to be 40 percent. (*Id.*). However, an echocardiogram performed shortly thereafter on June 16, 2016 showed his EF to be only 20 to 25 percent despite three months of "optimal medical therapy." (Tr. at 638). Therefore, a single chamber automated implantable cardioverter defibrillator (AICD) was placed in Claimant's chest on July 20, 2016 to prevent his "sudden cardiac death." (Tr. at 877).

On August 4, 2016, Claimant presented for an initial visit at Kaufman Center for Heart Failure at the Cleveland Clinic. (Tr. at 909). After a thorough review of Claimant's cardiac history and a physical examination, Dr. David O. Taylor assessed Claimant to be in New York Heart Association (hereinafter "NYHA") functional class

III, stage C, heart failure.[3] (Tr. at 913). Claimant underwent a stress test the following day, which measured his functional capacity to be 5.2 METS, and his echocardiogram estimated his EF to be 25 percent with a five percent margin of error. (Tr. at 926, 931).

On August 14, 2017, Dr. Lewis noted that Claimant complied with medications and lifestyle changes and lost nearly 40 pounds. (Tr. at 1101). Thus, he was doing "fairly well considering his fairly advanced ischemic cardiomyopathy." (*Id.*). Nevertheless, Claimant's repeat echocardiogram on August 22, 2017 estimated Claimant's EF to be only 20 to 25 percent. (Tr. at 1095). On December 7, 2017, Claimant presented for an annual defibrillator examination. (Tr. at 1107). His EF remained 20 to 25 percent. (Tr. at 1110). Dr. Lewis recorded on February 26, 2018 that Claimant continued to persevere, but had poor left ventricular function and extensive coronary artery disease with two previous infarcts. (Tr. at 1129).

### B. Evaluation and Opinion Evidence

On January 8, 2016, state agency physician, Amy Wirts, M.D., assessed Claimant's RFC based upon her review of Claimant's records. Dr. Wirts opined that Claimant could perform work at the light exertional level with no additional pushing, pulling, or manipulative restrictions, but she concluded that Claimant could never climb ladders/ropes/scaffolds and perform other postural activities occasionally. (Tr. at 57-58). Dr. Wirts additionally assessed that Claimant should avoid concentrated exposure to extreme cold, heat, vibration, and hazards. (Tr. at 58). Pedro F. Lo, M.D.,

---

[3] The NYHA Functional Classification places patients in one of the following four categories based on the extent to which they are limited by physical activity: Class I – no limitation; Class II – slight limitation; Class III – marked limitation; and Class IV – unable to carry on any physical activity without discomfort, including symptoms of heart failure at rest. An individual categorized as Class III, Stage C, is comfortable only at rest; less than ordinary activity causes fatigue, palpitation, or shortness of breath; and there is objective evidence of moderately severe cardiovascular disease. https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure.

affirmed Dr. Wirts' RFC assessment on May 11, 2016. (Tr. at 71-72).

### C. Claimant's Testimony

Claimant testified during the administrative hearing on April 4, 2018. He stated that he continued to hunt using a rifle. (Tr. at 38-39). His daily activities otherwise mainly included sitting and watching television, sometimes helping his wife cook, occasionally going to Walmart with his wife, and visiting friends or receiving friends that visited him. (Tr. at 39). He took at least three naps per day for 30 minutes to one hour due to fatigue. (Tr. at 46-47). Claimant stated that he became "winded" walking for ten minutes on flat ground, and could help his wife cook for only five minutes before sitting down. (Tr. at 45-46). Claimant further testified that both of his arms were numb around his elbows since he had a heart attack, and his hands tingled when he tried to use them. (Tr. at 47). According to Claimant, he dropped things all of the time, and the upper extremity issues extended into his shoulder, which gave him some trouble lifting things, but he did not have too much trouble reaching for items. (Tr. at 48).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct

a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.   Discussion**

As stated, Claimant challenges the ALJ's analysis of his chronic heart failure and degenerative disc disease. Each argument is considered below, in turn.

### A.    *Chronic Heart Failure*

In his first challenge, Claimant argues that the ALJ erred in concluding at step three of the sequential evaluation that his chronic heart failure did not meet or equal the criteria of Listing 4.02. (ECF No. 13 at 7-10). A claimant should be found disabled at step three of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing in Appendix 1 of 20 C.F.R. Part 404, Subpart P. *See* 20 C.F.R. § 404.1520(a)(4)(iii). The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments are set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, (1990). Because the listed impairments presume disability,

13

"[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

In the Fourth Circuit, "where there is factual support that a listing could be met," the ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91; *see also Ezzell v. Berryhill*, 688 F. Appx. 199, 200 (4th Cir. 2017) ("When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of the claimant's symptoms.'") (citing *Cook*, 783 F.2d at 1172-73) (internal markings omitted).

As is the case throughout the sequential evaluation process, the ALJ must set forth the reasons for the step three determination. *See, e.g*., *Radford v. Colvin*, 734 F. 3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). An ALJ's explanation is insufficient if it only states that the ALJ considered the listing of impairments and offers nothing to reveal *why* the ALJ made his or her determination. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the

14

ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."). Likewise, it is generally unacceptable for an ALJ to summarily conclude that a claimant does not have an impairment or combination of impairments that meets a listing; the ALJ's decision must include a discussion that applies the pertinent legal requirements of the listing to the record evidence. *Radford*, 734 F.3d at 295. While an "ALJ is not required to explicitly identify and discuss every possible listing", the ALJ "is compelled to provide a coherent basis for [the] Step Three determination." *Ezzell*, 688 F. App'x at 200 (citation omitted).

In *Radford*, the Fourth Circuit found that an ALJ's step three analysis was "devoid of reasoning" and the ALJ's summary conclusion that the claimant did not meet a listing made is impossible for a reviewing court to evaluate whether substantial evidence supported the ALJ's findings. *Radford*, 734 F.3d at 295. However, the Fourth Circuit noted that a full explanation by the ALJ was particularly important in Radford's case because the medical record included a fair amount of evidence supportive of his claim; in fact, the record contained five years of medical examinations and probative evidence strongly suggesting that Radford met or equaled the relevant listing. *Id.* Similarly, in *Fox*, the Fourth Circuit found that the ALJ failed to explain the step three finding despite inconsistent evidence in the file, including a treating physician's numerous statements about the claimant's severe limitations, which possibly supported a finding that the claimant met the relevant listing. *Fox*, 632 F. App'x at 755 (4th Cir. 2015).

Despite the admonitions of the Fourth Circuit in *Radford* and *Fox* regarding an ALJ's duty of explanation at step three, "if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may

provide a basis for upholding the ALJ's determination." *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016) (quoting *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011) ("Reading the ALJ's decision as a whole, substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting [the listing].")). Indeed, "the ALJ need only review medical evidence once in his opinion." *Id.* at *4 (quoting *McCartney v. Apfel*, 28 Fed. Appx. 277, 279 (4th Cir. 2002)). Ultimately, "[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Id.* (citing *Smith*, 457 Fed. Appx. at 328). Simply put, the written decision must demonstrate that the ALJ adequately performed all of the key tasks required by the sequential disability evaluation process. When the record includes conflicting evidence, or facts suggesting that the claimant might meet a listing, the ALJ's discussion is particularly important. Yet, "[i]f the court need not look beyond the ALJ's opinion to find substantial evidence supporting the ALJ's step-three determination, the ALJ's decision may be affirmed." *Marcum v. Berryhill*, No. CV 16-2297, 2017 WL 1095068, at *4 (S.D.W. Va. Mar. 23, 2017).

At issue in this case is Listing 4.02, which requires a claimant to first demonstrate the signs and symptoms of chronic heart failure and then show that the chronic heart failure meets the severity requirements of both paragraphs A and B of the listing. Listing 4.02 states:

> 4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of

severity for this impairment is met when the requirements in both A and B are satisfied.

A. Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 4.02 (effective April 2, 2018).

Here, the ALJ found at step two of the sequential evaluation that Claimant's "coronary artery disease/chronic heart failure" was a severe impairment. (Tr. at 12). At step three, the ALJ evaluated Claimant's heart disease under section 4.02 of the

Listing. (Tr. at 13). However, the ALJ stated that Claimant did not satisfy the criteria for systolic failure in paragraph A of Listing 4.02 because, although Claimant's EF "has fluctuated and fallen below 30 percent at times," it was above 30 percent in October 2015, March 2016, and May 2016. (*Id.*). Further, the ALJ stated that Claimant did not satisfy paragraph B of Listing 4.02 because his stress test in August 2016 showed that he had a functional capacity of 5.2 METS, which was above listing level. (*Id.*). The ALJ also cited that Claimant was active and able to go hunting in July 2016, and his cardiologist noted in March 2018 that Claimant was CHF functional class I-II with no rales, edema, jugular vein distension, or abnormal heart murmur. (*Id.*).

The ALJ, and the Commissioner in his brief, did not dispute that Claimant met the introductory paragraph of Listing 4.02 to establish chronic heart failure. However, as noted, the ALJ found that Claimant did not meet the severity criteria for systolic failure in paragraph A or the stress test results required of paragraph B of Listing 4.02. First, addressing paragraph A, systolic failure is defined as "[p]redominant systolic dysfunction (the inability of the heart to contract normally and expel sufficient blood), which is characterized by a dilated, poorly contracting left ventricle and reduced ejection fraction (abbreviated EF, it represents the percentage of the blood in the ventricle actually pumped out with each contraction)." *Id.* at § 4.00D1a(i). An EF of 30 percent or below during a period of stability (not during an episode of acute heart failure) meets the criteria for systolic failure under Listing 4.02.

The ALJ concluded that Claimant did not establish systolic failure because his EF was estimated to be 35 to 40 percent in his October 27, 2015 echocardiogram; less than 35 percent in his March 14, 2016 left heart catheterization; and 40 percent in his left heart catheterization on May 26, 2016. (Tr. at 13). However, while the ALJ

summarily acknowledged that Claimant's EF "has fluctuated and fallen below 30 percent at times," the ALJ did not explain why he disregarded the numerous test results during the relevant period that fell within or below the 30 percent EF threshold set forth in Listing 4.02. For instance, the ALJ relied upon the fact that Claimant's left heart catheterization on March 14, 2016 showed his EF to be less than 35 percent, which was slightly above listing level. Yet, as the clinical record clearly stated in discussing the heart catheterization results, a current echocardiogram was pending. (Tr. at 647). The echocardiogram, as well as a stress test, were performed the following day on March 15, 2016, and those tests measured Claimant's EF to be 30 to 35 percent and 29 percent, respectively. (Tr. at 709-10, 744). The ALJ did not explain why he chose to rely on Claimant's heart catheterization EF of less than 35 percent from one day earlier at the exclusion of this evidence that appeared to meet the listing.

Moreover, the ALJ relied on the fact that Claimant's EF was estimated to be 40 percent during his May 2016 heart catheterization, but the ALJ did not discuss the fact that Claimant's EF was subsequently only 20 to 25 percent per his echocardiogram on June 16, 2016, despite three months of "optimal medical therapy." (Tr. at 633). An automatic defibrillator was implanted to prevent Claimant's "sudden cardiac death," but his August 5, 2016 echocardiogram at the Cleveland Clinic estimated his EF to still be only 25 percent with a five percent margin of error. (Tr. at 931). Even with significant lifestyle changes and medication compliance, Claimant's repeat echocardiogram on August 22, 2017 measured his EF as 20 to 25 percent. (Tr. at 1095). Claimant's EF remained 20 to 25 percent thereafter on December 7, 2017. (Tr. at 1110). Therefore, the record very clearly documented over a year of EF results below the 30 percent benchmark provided in the listing, but the ALJ neglected to explain why such tests did

not establish Claimant's systolic failure under Listing 4.02. As Claimant indicated, if the ALJ questioned the reliability of the tests or had some other valid reason to discount them, he did not articulate any such reasons in his decision.

Next, turning to paragraph B of Listing 4.02, the ALJ determined that Claimant's stress test in August 2016 showed that he had a functional capacity of 5.2 METS, which was above the listing level of 5 or less METS. (Tr. at 13). However, the ALJ did not explain why Claimant's earlier stress test on July 10, 2015, which showed his functional capacity to be 4.6 METS, did not satisfy the listing. Again, the ALJ's lack of explanation for rejecting critical conflicting evidence during the relevant period precludes meaningful review of his decision.

When evidence exists that a claimant meets a disability listing, but the evidence is rejected without discussion, "'insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings.'" *Coe v. Berryhill,* No. 1:15CV1077, 2017 WL 886858, at *3 (M.D.N.C. Mar. 6, 2017) (quoting *Bailey v. Colvin,* No. 1:14CV303, 2015 WL 5227646, at *3 (M.D.N.C. Sept. 8, 2015)). As the Fourth Circuit explained in *Radford*, the ALJ's discussion is particularly important when the record includes conflicting evidence or facts suggesting that the claimant might meet a listing. *Radford*, 734 F.3d at 295.

Therefore, because the ALJ's step three determination lacks adequate explanation to allow for meaningful review, the undersigned **FINDS** that the decision is not supported by substantial evidence and the matter must be remanded so that the ALJ can reconsider or elaborate upon the step three finding regarding Listing 4.02.

### B. Degenerative Disc Disease

Claimant next argues that the ALJ failed to explain in the RFC analysis how his

degenerative disc disease of the cervical spine affected his ability to perform the mental and physical demands of competitive employment on a regular and competitive basis, and the ALJ did not explain the rationale for omitting additional RFC limitations relating to the impairment.

Social Security Ruling 96-8p (SSR 96-8p) provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Among other functions, the ALJ must assess an individual's manipulative functions, such as the ability to reach. *Id.* at *1; 20 CFR § 404.1545(b-d). In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. Finally, the "RFC assessment must always consider and address medical source opinions," and, if "the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

In this case, the ALJ concluded at step two of the sequential evaluation that Claimant's degenerative disc disease was a severe impairment. (Tr. at 12). In assessing Claimant's RFC, the ALJ noted that Claimant's May 2016 MRI showed moderate neural foraminal narrowing in his cervical spine. (Tr. at 15). However, the ALJ stated

that Claimant's gait was normal, he was able to walk on toes and heels, and he remained active and was able to go hunting. (*Id*.). The ALJ gave great weight to the opinions of the state agency physicians, who concluded that Claimant could perform a reduced range of light work. (Tr. at 15-16).

Claimant does not identify any critical conflicting evidence that the ALJ overlooked regarding his cervical spine impairment or functional abilities. The ALJ's RFC assessment is consistent with the medical opinions in the file. Both reviewing physicians concluded that Claimant could perform work at the light exertional level with occasional postural activities, but no climbing ladders/ropes/scaffolds. (Tr. at 57-58, 71-72). Notably, the experts agreed that Claimant did not have any additional pushing, pulling, or manipulative restrictions beyond the above limitations. (*Id*.).

Furthermore, the ALJ's analysis is consistent with the medical evidence in the record. In May 2016, Claimant sought treatment for neck and right hand pain, which he stated began two years earlier right after his heart surgery. (Tr. at 625). He was diagnosed with carpal tunnel syndrome, cubital tunnel syndrome, cervical radiculopathy, and weakness. (Tr. at 626). The neurologist ordered nerve conduction studies and an MRI of Claimant's cervical spine. (Tr. at 626-27). The MRI taken on May 31, 2016 showed bilateral neural foraminal narrowing at C5-6 that was moderate on the right and moderate-to-severe on the left. (Tr. at 629). However, there was no contact with Claimant's spinal cord and his spinal cord signal was normal. (*Id*.).

Claimant was referred to neurosurgeon, Dr. Saulle, for his complaints of numbness and tingling in his forearms and hands. (Tr. at 1029). Dr. Saulle examined Claimant on September 21, 2016 and diagnosed him with cervical spondylosis, bilateral carpal tunnel syndrome, and cubital tunnel syndrome. (Tr. at 1031). Claimant told Dr.

Saulle that the symptoms were not bothering him enough that he wanted to consider surgery to correct the problem. (*Id.*). As such, Dr. Saulle did not proceed with the EMG, and he advised Claimant to return if he wished to consider surgical intervention. (*Id.*).

Claimant argues that the ALJ did not consider his own subjective statements regarding his degenerative disc disease symptoms. (ECF No. 13 at 12-13). An ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. § 404.1529 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the

23

ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

Although a claimant's allegations about her pain may not be discredited

> solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own

assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ clearly performed the two-step process to evaluate Claimant's subjective symptoms. The ALJ noted Claimant's reported daily activities, which included sitting on the couch most of the day, helping his wife cook, going to Walmart on occasion with his wife, visiting with his friends, fishing, and hunting with a rifle. (Tr. at 14). However, the ALJ found that Claimant's allegations of disabling conditions were not fully supported by the objective evidence, noting that despite Claimant's complaints of neck pain and moderate neural foraminal narrowing, Claimant's gait was normal. (Tr. at 15). While the ALJ's analysis of Claimant's degenerative disc disease was not lengthy, neither was Claimant's medical evidence regarding that impairment. The ALJ's discussion was proportionate to the minimal mention in the record of any functional issues related to Claimant's cervical spine impairment. Claimant does not offer any argument to dispute the ALJ's above analysis or conclusions. Furthermore, Claimant does not point to any requirement that the ALJ explicitly discuss or cite each of his subjective allegations. Rather, Claimant argues that the ALJ's decision must demonstrate that he considered the relevant evidence and provide a logical nexus

26

between the evidence and his conclusions. The ALJ performed that function in this case. As summarized above, the ALJ considered the relevant evidence concerning Claimant's functional abilities and articulated a cogent RFC assessment with specific citations to the record. Therefore, the undersigned **FINDS** that the ALJ's analysis of Claimant's degenerative disc disease and the associated RFC assessment are supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

For the above reasons, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, to the extent that it requests remand, (ECF No. 13); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 14); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of

*de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** March 31, 2020

Cheryl A. Eifert
United States Magistrate Judge